UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

MICHAEL J. WITKOWSKI,

        Plaintiff,

v.                                                     Case No. 05-C-442

MILWAUKEE COUNTY,

DIANE MOORE, individually and in her
official capacity as Captain, Court Services
Division, Sheriff's Department, Milwaukee County,

LUIS LOPEZ, individually and in his
official capacity as Sergeant, Court Services Division,
Sheriff's Department, Milwaukee County,

STEVEN J. GUNN, individually and in his
official capacity as Deputy/Bailiff, Court Services
Division, Sheriff's Department, Milwaukee County,

ANDREW M. HALSTEAD, individually and in his
official capacity as Deputy/Bailiff, Court Services
Division, Sheriff's Department, Milwaukee County,

and

WISCONSIN COUNTY MUTUAL INSURANCE
COMPANY, a domestic corporation,

        Defendants.

---

## DECISION AND ORDER

---

      This case arises out of a well-publicized courthouse shooting which took place in the Milwaukee County Safety Building in May of 2002. Following a week-long jury trial, Laron Ball ("Ball") was found guilty of murder. After the verdict was read, Ball leapt into

the jury box, gained control of Deputy Sheriff Michael J. Witkowski's ("Witkowski") revolver, and shot Witkowski in the leg. Ball was then shot and killed in the courtroom by an undercover police detective who had testified against him at his trial.

Witkowski has brought 42 U.S.C. § 1983 claims against Milwaukee County, the County's insurer (Wisconsin County Mutual Insurance Company, "WCMIC"), and various courthouse officials (collectively the defendants) for alleged due process and equal protection violations. The defendants have moved for judgment on the pleadings. Fed. R. Civ. P. 12(c). For the reasons that follow, this motion is granted.

## FACTUAL BACKGROUND

While awaiting his trial in the Milwaukee County jail, Ball stated to others his intention to seize a courtroom bailiff's gun, shoot the presiding judge, and escape in the resulting confusion to avoid going to prison in the event of a guilty verdict. (Complaint, ¶ 10). City of Milwaukee officials informed the Milwaukee County Sheriff's department of Ball's threat, which was corroborated by County officials in the time leading up to trial. (Complaint, ¶ 11).

Judge Jacquelline Schellinger ("Judge Schellinger"), the judge assigned to preside over Ball's trial, met with Diane Moore ("Captain Moore"), a Captain from the Sheriff's Department Court Services Division, to discuss the security risk posed by Ball. (Complaint, ¶ 12). Captain Moore and Judge Schellinger agreed that the following security measures should be undertaken for the trial: (1) a secure courtroom; (2) additional deputies and bailiffs

in addition to the two ordinarily assigned to each courtroom; and (3) the use of a high-voltage stunbelt on Ball. (Complaint, ¶ 13).

The first week of the trial took place in Judge John DiMotto's secure courtroom, May 20-24. Deputy Steven Gunn ("Gunn") and Deputy Andrew Halstead ("Halstead"), Judge Schellinger's normal bailiffs, along with additional bailiffs from Judge DiMotto's courtroom, were assigned to the trial during its first week. (Complaint, ¶¶ 14, 17). Ball wore a stunbelt throughout the first week of the trial. (Complaint, ¶ 14).

Ball's trial reconvened on May 28 in Judge Daniel Konkol's courtroom in the Milwaukee Safety Building. (Complaint, ¶ 15). Additional security was not assigned for the trial's continuation. (Complaint, ¶ 17-18). However, Judge Konkol's courtroom shared an inmate holding area with Judge Mary Kuhnmuench's courtroom. Witkowski was one of Judge Kuhnmuench's bailiffs. (Complaint, ¶ 15).

Gunn and Halstead had mixed feelings about the use of the stunbelt and considered its operation an irritating hindrance on their other job duties. They were told by Captain Moore that they had the prerogative not to use the stunbelt on Ball. (Complaint, ¶ 18). Nonetheless, Gunn and Halstead used the stunbelt on May 28. (*Id.*) At lunch on May 28, Witkowski saw the battery charger for the stunbelt on a desk in the common area between Judge Konkol and Judge Kuhnmuench's courtroom. Witkowski asked what it was, and Halstead told him that Judge Schellinger was requiring them to use the stunbelt on Ball. (*Id.*)

The Ball trial ended on the morning of May 29, 2002. After instruction and deliberation, the jury was summoned back to court for reinstruction because of an error in the prior instructions. Gunn decided to bring Ball back into court for the reinstruction without use of the stunbelt. (Complaint, ¶ 20). Gunn told Halstead that he had removed Ball's stunbelt. (*Id.*)

When the jury reached its verdict, Gunn had left on other matters, so Halstead decided to bring Ball back into court without Gunn and without the stunbelt. Judge Kuhnmuench's court was in recess, so Halstead asked Witkowski for assistance. (Complaint, ¶ 21). Witkowski agreed without knowing that Ball was no longer wearing the stunbelt. (*Id.*) After the verdict was read, Ball leapt into the jury box, grabbed Witkowski's gun, and shot Witkowski, before being shot and killed by a Milwaukee police detective in attendance at the trial. (Complaint, ¶ 22).

**STANDARD OF REVIEW**

A motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) is subject to the same standard as a motion to dismiss for failure to state a claim under Rule 12(b)(6). *See, e.g., Craigs, Inc. v. Gen. Elec. Capital Corp.,* 12 F.3d 686, 688 (7th Cir. 1993); *Thomasan v. Nachtrieb,* 888 F.2d 1202, 1204 (7th Cir. 1989). A complaint is subject to dismissal under Rule 12(c) if "it appears beyond doubt that the plaintiff cannot prove any set of facts that would support his claim for relief." *Thomason*, 888 F.2d at 1204 (citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). In deciding this motion, the Court must view the

allegations in the complaint in the light most favorable to Witkowski, the non-movant. *Thomason*, 888 F.2d at 1204.

## DISCUSSION

**I.     DUE PROCESS**

Witkowski's due process claim is based on the premise that the defendants exposed him to danger without warning and without protection by assigning him to guard Ball when his verdict was read. In *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189 (1989), the Supreme Court held that, "[a]s a general matter, . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney*, 489 U.S. at 197. The Due Process Clause confers "no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *Id.* at 196.

The rule in *DeShaney* does not apply if the state has a "'special relationship' with a person, that is, if the state has custody of a person, thus cutting off alternative avenues of aid." *Monfils v. Taylor*, 165 F.3d 511, 516 (7th Cir. 1998). This exception arises from limitations the state may have imposed on the individual through a restraint of personal liberty. *DeShaney*, 489 U.S. at 200. *DeShaney* is also inapplicable where the state "affirmatively places a particular individual in a position of danger the individual would not otherwise have faced." *Monfils*, 165 F.3d at 516 (citations and internal quotations omitted). Neither exception to the general rule of *DeShaney* applies in this case.

In *Walker v. Rowe*, 791 F.2d 507 (7th Cir. 1986), the Seventh Circuit held that prison guards who had been injured or killed during a prison riot could not state substantive due process claims against the prison officials. The court rejected the prison guards' claims even under the assumption that the prison officials knowingly increased the risk to the prison guards and had been grossly negligent in failing to reduce those risks. *Id.* at 509. The court explained that governments "regularlyسacrifice safety for other things. A city may decide to spend more money on parks or education and less on police. . . . It may do this without answering in damages to people subsequently mugged in the parks." *Id.* at 510. Correspondingly, the safety of the guards (and other state employees) is affected "as much by the guards themselves as by the choices made by the state. . . . Having decided that the combination of pay, benefits, and safety is satisfactory, the guards cannot turn around and say that the constitution required that safety be a larger component of the total package. *The constitution no more assures a safe job than it does a job with a generous salary.*" *Id.* (emphasis added) (internal citations omitted).

Similarly, the Seventh Circuit followed the rationale and holding of *Walker* in *Wallace v. Adkins*, 115 F.3d 427 (7th Cir. 1997), where the court held that a prison guard who was repeatedly stabbed by an inmate could not state a substantive due process claim. In *Wallace*, the plaintiff-prison guard had a personal history with the inmate, who had threatened to kill him in the past. Prison officials were aware of the prisoner's prior threat against the prison guard. Nonetheless, one day the warden assigned the prison guard to guard the prisoner and ordered him to stay at his post after he complained. The court

-6-

rejected the argument that a "special relationship" existed by virtue of the prison's knowledge that the prisoner had made a threat against the prison guard. The court reasoned: "[u]nlike a prisoner, a person involuntarily committed to a mental institution, or a child placed by state authorities in a foster home, [the plaintiff] was free to walk out the door any time he wanted." *Wallace*, 115 F.3d at 430. Therefore, "prison guards ordered to stay at their posts are not in the kind of custodial setting required to create a special relationship for" purposes of due process. *Id.* Furthermore, the court rejected the claim that prison officials affirmatively placed the guard in a position of danger he would not otherwise have faced. Even without the official order to stay at his post, the guard "would have had a duty to remain on his post whether or not the prison officials said a word. There is no doubt that [the plaintiff] was in danger . . . and that the officials knew of the danger. . . . *But these are the risks of the guard's job*." *Id.* (emphasis added).

The Court finds that the holdings of *Walker* and *Wallace* are controlling and mandate that Witkowski's due process claims be dismissed. Like the prison guards in those cases, Witkowski's job duties included the handling and controlling of dangerous and violent prisoners. Witkowski chose his profession, and he obviously knew or should have known of its attendant risks. He was not a captive prisoner, and he was no more or less at risk than any of the other deputy/bailiffs on duty that day. That the incident was unfortunate and (apparently) avoidable is of no consequence for purposes of this claim.

## II.  EQUAL PROTECTION

Witkowski also claims that the defendants deprived him of equal protection by virtue of placing him in a particular position of danger. As plaintiff frames the issue, his claim is not a claim of "suspect-class" equal protection deprivation, but instead is one of "irrational or arbitrary classification." (Pl. Br. at 16). This is known as a "class of one" equal protection claim. A "class-of-one" plaintiff must show (1) he has been intentionally treated differently from others that are similarly situated; and (2) there is no rational basis for the difference in the treatment, or the cause of the treatment is a totally illegitimate animus towards the plaintiff. *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam). Witkowski's claim fails under both parts of the analysis.

Under the first prong, Witkowski argues that defendants deviated from "mandatory security requirements" so as to "single out" Witkowski and expose him to the danger posed by Bell. (Pl. Br. at 18). However, the allegations in the complaint make it clear that Witkowski was not singled-out by the defendants. The withdrawal of security measures may have exposed Witkowski to danger, but it exposed *everyone* in the courtroom to the danger. It is far-fetched to suggest that the withdrawal of security measures was done to intentionally place Witkowski in harm's way, *i.e.*, to subject him to disparate treatment. The mere fact that Witkowski was injured as the result of an unfortunate chain of events does not mean that he was subject to disparate treatment at the hands of the defendants.

Under the second prong, the Seventh Circuit recently held, in an attempt to reconcile a divergence in the case law,[1] that a class-of-one plaintiff must "negative any reasonably conceivable state of facts that could provide a rational basis for the classification." *Lauth v. McCollum*, 424 F.3d 631, 634 (7th Cir. 2005). "Animus thus comes into play only when, no rational reason or motive being imaginable for the injurious action taken by the defendant against the plaintiff, the action would be inexplicable unless animus had motivated it." *Id.* Even if it could be said that Witkowski was subject to disparate treatment, Witkowski's allegations fail to disprove or even disavow any of the possible rational bases for the defendants' actions on that day.[2] Witkowski's claim falls far short of meeting this demanding standard.[3]

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

1. The Defendants' Motion for Judgment on the Pleadings [Docket #9] is **GRANTED**; and

---

[1] *See Racine Charter One, Inc. v. Racine Unified Sch. Dist.*, 424 F.3d 677, 683-84 (7th Cir. 2005) (discussing the "animus" and the "rational basis" lines of cases).

[2] The Seventh Circuit allows this inquiry to be conducted on the pleadings: "Since hypothesis is not proof, this test that we have articulated can often be applied in advance of discovery." *Lauth v. McCollum*, 424 F.3d 631, 634 (7th Cir. 2005).

[3] The Court also finds, in the alternative, that the individual defendants (Captain Moore, Sergeant Lopez, Officer Dunn, and Officer Halstead) are entitled to qualified immunity, as there is no clearly established constitutional right that a criminal defendant who threatens to escape be restrained by a stun belt. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Furthermore, the claims against the County's insurer (WCMIC) must be dismissed as a matter of law. *See Gibson v. City of Glendale Police Dep't*, 786 F. Supp. 1452, 1455 (E.D. Wis. 1992) (Wisconsin's "direct action" statute does not authorize a plaintiff to sue an insurer under § 1983 for alleged constitutional violations where there is no suggestion that the insurers had any causal connection to the allegedly constitutional acts).

2. This matter is **DISMISSED** with prejudice.

Dated at Milwaukee, Wisconsin, this 30th day of August, 2006.

                    **SO ORDERED,**

                    **s/Rudolph T. Randa**
                    **HON. RUDOLPH T. RANDA**
                    **Chief Judge**